UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

STEWART L. SKUBA,

    Petitioner,

v.

JOE A. LIZARRAGA,

    Respondent.

Case No. 14-cv-03758-JD

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY**

This is a habeas corpus petition filed by Stewart Skuba, a pro se prisoner, pursuant to 28 U.S.C. § 2254. The Court ordered respondent to show cause why the writ should not be granted and respondent filed an answer and lodged exhibits with the Court. The petition is denied.

## BACKGROUND

On December 16, 2011, a Santa Cruz County jury convicted Skuba of first degree murder and robbery, and found true a robbery-murder special circumstance. Mem. of Points and Authorities in Support of Answer, at 1. On February 23, 2012, the trial court sentenced Skuba to life in prison without the possibility of parole. The California Court of Appeal affirmed the judgment of conviction, and the California Supreme Court denied review.

The California Court of Appeal summarized the facts of the crime as follows:

> A. Prosecution's Case
>
> The prosecution alleged that Skuba and his friend Adam Hunt robbed Elias Sorokin in Skuba's Santa Cruz home on or about July 20, 2009. After the robbery, Skuba and another friend Kenneth Clamp moved an unconscious Sorokin to the bed of Sorokin's pick-up truck, drove north on Highway 1, and threw Sorokin off a cliff. Sorokin's body was not recovered at the time of trial. Skuba was charged with first degree felony murder (Pen.Code, §§ 187, 190.2, subd. (a)(17)), second degree robbery (Pen.Code, § 211), and

kidnapping (Pen.Code, § 209). The prosecution presented testimony from four witnesses who were at Skuba's home when the robbery occurred: Skuba's close friend Kristin Roberts, Roberts' father George Roberts, Sr. (Senior), Roberts' younger brother George Roberts, Jr. (Junior), and a friend Timothy Wentzel. The testimony of each is summarized below as it relates to this appeal.

1. Roberts' Testimony

In July 2009, 19–year–old Roberts was living with Skuba at his home on Felix Street. Skuba, who was about 30, shared his ground-floor bedroom with Roberts without charging her rent. Roberts was an alcohol and methamphetamine addict. She started using alcohol excessively when she was 16. In 2009, she drank continuously and was intoxicated most of her waking hours. She smoked methamphetamine a lot, sometimes with Skuba. Roberts' alcohol and methamphetamine use "blurred things" from that time period.

Before July 20, 2009, Skuba had bragged to Roberts about a friend from Los Angeles who was a "big time pot dealer." Two days before Sorokin was murdered, Skuba told Roberts someone from Los Angeles was going to visit, either with marijuana or to buy marijuana. On July 20, Skuba told Roberts someone was coming from Los Angeles and "we are going to jack him for his weed." Also on July 20, Roberts found a small bottle wrapped in tape in Skuba's bedroom. Skuba told her it was chloroform and could be used to knock a person out.

During the evening of July 20, Skuba and his friends Adam Hunt and Timothy Wentzel smoked methamphetamine in Skuba's bedroom, and Roberts "hung out" with them drinking. Roberts had been drinking whiskey from the time she woke up. She felt the effects of the alcohol but was able to walk and converse. At some point Skuba asked Roberts and Wentzel to go upstairs so he could "handle some business." After watching television in the upstairs living room for about 30 minutes, Roberts heard sounds of a struggle from downstairs and someone saying "Please don't. Stop." Roberts was upset, turned up the television, and said "No Stewart."

Senior entered the living room from the bedroom he shared with Junior. He was upset and dialing 911 on his phone. Roberts thought Skuba was doing what he had told her earlier—"jacking some guy for his weed"—and she wanted to protect him so she told Senior not to call the police. Senior acceded to his daughter's wishes and left the house with Junior. About 15 minutes later Skuba came upstairs sweating and appearing freaked out. He continued to the third floor carrying the clothes he had been wearing earlier, and Roberts heard the washing machine start. Skuba returned to the second floor and told Roberts it was okay to go back downstairs.

Roberts and Wentzel went downstairs and Wentzel left the house. Roberts knocked on the bathroom door. She heard running water and Hunt say "I'm in here." She joined Skuba on the porch and smoked a cigarette. Skuba told Roberts the chloroform did not work, that he and Hunt got into a fight with "him," that "he" was knocked out, and not to go into the garage. Roberts went outside

and saw Sorokin's truck in the driveway. She climbed inside looking for something to steal, but found nothing she wanted. Skuba told her to get out of the truck and she returned to the house with him.

Appearing upset, Skuba told Roberts that Hunt had left. Skuba called his friend Kenneth Clamp and said "Hey home boy, get over here. I need your help." Not long afterward, Clamp arrived. When he saw Roberts, Clamp said "What the hell is she doing here?" Clamp asked Skuba if he could live with this for the rest of his life. Freaked out, Skuba responded "Yes. He knows where my mom lives." As Skuba grabbed a blue blanket from his closet, Clamp told Roberts to clean up the blood after they left. Skuba left through the back door with the blue blanket, Clamp left through the front door, and Roberts went upstairs to the living room balcony. From the balcony Roberts heard the garage door opening and closing, a dragging sound from the area of the garage, a tailgate opening, a thump, a tailgate closing, and trucks leaving.

After Skuba and Clamp left in the trucks, Roberts cleaned up blood in the bathroom. She went to Skuba's bedroom and saw items she had not seen before, including a wallet, a laptop, a guitar, boxes containing marijuana pills, and ten bags of marijuana in the closet. She looked through the wallet and saw Sorokin's driver's license and credit cards. She entered the garage and cleaned up more blood. She saw drag marks near the front of the garage.

Skuba and Clamp returned after being gone for at least an hour, and Hunt reappeared about 30 minutes later. Clamp divided the bags of marijuana equally among the men and gave one bag to Roberts. The group also divided up the marijuana pills and may have divided up the credit cards. Skuba and Hunt spoke about the fight they had with Sorokin. After Clamp and Hunt left the house, Skuba told Roberts he and Clamp had driven up the coast toward Davenport– Skuba in Sorokin's truck and Clamp in his own-and that "[t]hey threw him off a cliff." Skuba told Roberts "he could hear the body go thudding down."

The next day Roberts left Skuba's house with Senior and Junior for a motel. On July 22 Roberts went to a Target store in Watsonville with Skuba and attempted to purchase over $500 in merchandise using one of Sorokin's credit cards. The card was refused. A few days later, after seeing missing person flyers identifying Sorokin, Roberts told Senior that Sorokin was at Skuba's on July 20 and that she had cleaned up the blood. When she confided in Senior, she had no bad feelings for Skuba, but she was scared of Clamp. Senior advised her to call the police.

On July 30, Roberts and Skuba were passengers in a stolen car pulled over by the police. The group was headed to Watsonville to sell marijuana. Roberts was arrested and asked to speak with a detective, whom she told about the murder because she did not want it on her conscience. She told police that Skuba, Hunt and Clamp were involved in the murder, and she eventually admitted that she had cleaned up the blood.

3

Roberts pleaded guilty to the robbery in this case and had not been sentenced at the time of Skuba's trial. A condition of her plea agreement required her to testify truthfully. Roberts acknowledged a felony forgery conviction from July 2009, which involved her cashing two checks stolen from one of Skuba's roommates. She also acknowledged a conviction for driving under the influence of alcohol, an incident which involved an accident in which a third party was injured.

2. Senior's Testimony

Senior came to Santa Cruz in July 2009 to help Roberts who was having problems with alcohol and the law. Because Senior was financially strapped, Skuba opened his home to Senior and his 17–year–old son. On the night of Sorokin's murder, father and son shared an upstairs bedroom. Senior knew that Roberts drank abusively and smoked methamphetamine.

On July 19 or 20 Senior observed a small container wrapped in what looked like electrical tape in Skuba's bedroom. Skuba told Senior it was chloroform, and Senior joked about using the chloroform on a landlord to whom he had lost a deposit.

On the night of the murder Senior was awakened by Junior shaking him and telling him it sounded like someone was being beaten or killed. Senior heard crashing around, as if someone was having an argument and was pushed into furniture. He heard muffled voices and what appeared to be cries for help. The noise came from Skuba's room which was under the kitchen next to the garage. Senior entered the living room about to call 911, but Roberts told him not to. Senior gathered some things and, followed by Junior, left the house because of the noise. He went to his car parked on the street. Before falling asleep he saw a red pickup truck enter the driveway. He also saw Sorokin's truck and the red truck pull out of the driveway.

Reentering the house the next morning, Senior smelled very fresh marijuana coming from Skuba's room and a big black bag in front of Skuba's closet. He had not smelled marijuana in the house before. Skuba and Roberts both gave Senior marijuana from the bag. Senior also saw a black guitar case in the room and Sorokin's credit cards on Skuba's bed. Roberts offered one of the credit cards to Senior, but he would not take it. Senior did not notice the bottle that Skuba earlier had said contained chloroform. Senior left Skuba's home for a motel with Roberts and Junior. Several days after the murder Roberts told Senior what had happened. She told Senior she knew something was going to happen but she was not there when it happened, and that "they" made her clean up blood in the garage. She was crying hysterically and scared for her life.

3. Junior's Testimony

Junior was 17 and homeless when he met Skuba in July 2009. Skuba was kind to Junior and protected him, and Junior considered Skuba a true friend. Two or three days before Sorokin's murder, Skuba, Senior, and Junior had a conversation about chloroform.

4

Junior did not remember who brought up the subject, but Senior joked about using chloroform on a landlord who had cheated him out of some money.

On the night of the murder, when Junior was in his bedroom laying next to his sleeping father, he heard a muffled male scream and banging as if someone were fighting. Concerned, he awakened Senior who said he would call 911 but ultimately did not because Roberts told him not to. Instead, Senior and Junior left the house. Catching up with Junior outside, Skuba told him to stop crying and said something like, "I just did something to help you guys so please calm down. Everything is going to be alright." Junior joined Senior in the car for the night. He saw a red truck arrive and later the red truck and another truck leave.

The next day before Junior left for the motel, Skuba gave him the acoustic guitar that was in his bedroom. Roberts showed Junior a black bag in Skuba's closet containing clear plastic bags. Each clear bag contained a pound or two of marijuana. Roberts gave Junior and Senior some of the marijuana.

4. Wentzel's Testimony

In July 2009, Wentzel had known Skuba for a couple of months and Roberts for about a month. He bought methamphetamine from Skuba, smoked with him, and became friends with him. Wentzel also smoked methamphetamine with Roberts, but she drank more than she smoked.

The night of the murder Wentzel went to Skuba's house to buy methamphetamine. He joined Skuba, Roberts and Hunt in Skuba's bedroom. Roberts, who was drinking hard alcohol from a bottle, was drunk and slurring her words. Wentzel and Skuba smoked methamphetamine for about an hour while Roberts drank. At some point Skuba asked Wentzel and Roberts to go upstairs because he had "some business" to handle. While Hunt remained in Skuba's bedroom, Wentzel and Roberts went upstairs and watched television.

Wentzel heard a commotion downstairs, as if two people were rough-housing or throwing things across the room. The ruckus grew louder and sounded like a fight. Roberts, emotional with tears in her eyes, said "Oh, Skuba, no. Skuba, no. Don't." Twice she turned up the television to drown out the sounds. Wentzel also was trying to "tune it out." Senior came out of the bedroom and argued with Roberts. He did not like the noise and, followed by Junior, went downstairs. Wentzel and Roberts remained in the living room until an out-of-breath Skuba came upstairs and told them they could go downstairs because his "business" was finished. Wentzel left the house.

B. The Defense's Case

Skuba befriended Sorokin through large-scale marijuana dealings. In 2008, Skuba earned about $70,000 selling marijuana. That same year Sorokin rejected an offer to buy several pounds of marijuana

5

from Hunt because the marijuana was grown outdoors.

Skuba met Roberts when she was 17 and homeless. They were good friends and involved romantically "off and on." Roberts drank excessively and sold drugs. Although he had smoked methamphetamine daily in the past, Skuba was smoking methamphetamine less frequently-a couple of times per week-when Roberts started staying with him in May 2009.

Senior came to Santa Cruz in July 2009 to help Roberts with upcoming court appearances. Shortly after Senior arrived, Roberts was arrested for cashing a bad check. When Roberts was in jail, Skuba invited Senior to stay at his house through the end of the month.

On July 17, Skuba's friend Dominic fronted Skuba ten pounds of marijuana, which Skuba put in his bedroom closet. The marijuana, valued at $30,000, emitted no odor because it was sealed in turkey bags. Skuba had only $1,800 at the time, and was planning to sell the marijuana to Sorokin, with whom he was in close contact. In arranging the July 20 visit, Skuba also told Sorokin he would pay him back $500 if he came to Santa Cruz.

On the night of the murder, Roberts, Hunt, and Wentzel were with Skuba in his bedroom when Sorokin called. Skuba walked two blocks to the 7–Eleven to meet Sorokin. They returned in Sorokin's truck where Sorokin waited while Skuba told Roberts and Wentzel to go upstairs. Skuba first testified that Sorokin arrived about 11:00 p.m., but later said it might have been after 12:31 a.m., when cell phone records showed Sorokin placed his last call to Skuba. Sorokin came inside with his guitar and laptop. He, Skuba, and Hunt socialized for at least an hour or so on the back patio. Later, when confronted with phone records showing Hunt called him at 12:58 a.m. and 1:12 a.m., Skuba testified he was not sure how long he and Hunt socialized with Sorokin. It may have been only 35 minutes but it felt longer.

Skuba showed Sorokin a pound of the marijuana from his closet and told him ten pounds were available. He then returned the pound to the front of his closet, leaving the other nine pounds in a large bag. Skuba gave Sorokin the $500 he owed him, and Sorokin gave Skuba three boxes of medical marijuana pills that were given to him as samples and he no longer wanted.

Hunt then went outside to "holler at" Sorokin because he was upset about their 2008 failed marijuana deal. Skuba could not see them, but he heard Hunt talking about $30,000 and getting stuck with ten pounds of marijuana. Skuba went to the porch and suggested they move their discussion to the garage so as not to disturb the neighbors. Hunt and Sorokin went into the garage and Skuba listened to music in his room over surround sound speakers. He was high on methamphetamine, not listening for noise, and heard nothing from the garage.

Hunt returned a few minutes later, washed blood off his hands in the bathroom, and threatened Skuba with a gun. Hunt told Skuba he

6

would kill him if he called the police, and he knew where his family lived and would kill them too.

Skuba entered the garage where he found a dead Sorokin. Skuba had no idea Hunt was going to kill Sorokin. Skuba went back inside but Hunt was gone. Skuba followed Junior outside and told him "Something crazy just happened. I've got a lot going on right now." He returned to the house with Roberts, whom he had found in Sorokin's truck. Skuba did not call the police because he was afraid for himself and his family. He thought Hunt would kill him. Instead, Skuba called his friend Clamp, a "big bad dude" who has been to prison for attempted murder and who Skuba thought could protect him from Hunt.

When Clamp arrived he confirmed that Sorokin was dead. Skuba told Clamp what happened (except he did not tell him that he had arranged a marijuana deal for Sorokin) and asked Clamp for advice. Clamp told Skuba he could either "clean it up" or call the police. Clamp told Skuba he had to make a decision that would affect the rest of his life. Skuba told Clamp "he knows where my parents live," but he was referring to Hunt, not to Sorokin who was dead.

Hunt then returned and told Clamp he killed Sorokin because Sorokin had disrespected him. When asked by Clamp whether he took anything, Hunt told him he took $500 from Sorokin's pocket, and he also mentioned that Sorokin had come to buy marijuana that was in the closet. To the horror of Skuba, Clamp discovered the marijuana in Skuba's closet and decided to keep it. Clamp took control of the situation, went into the garage with Hunt, and loaded Sorokin's body in the back of Sorokin's truck. Clamp and Hunt returned to Skuba's room, where Clamp asked Roberts if she would remain solid and told her they would give her marijuana if she cleaned up the blood in the garage. Hunt gave her a bottle of cleaner from his backpack. Clamp told Skuba to drive Sorokin's truck up the coast, he would follow, and Hunt would stay behind and watch Roberts.

As they left Santa Cruz, Clamp took the lead. They turned off Highway 1 and drove into the mountains, but ended up back on Highway 1 near the ocean, where Clamp told Skuba to switch vehicles. Skuba waited in Clamp's truck for about a half hour, and when Clamp returned they drove back to Skuba's home.

Skuba and Clamp returned to find Hunt and Roberts in his bedroom going through Sorokin's credit cards and laptop bag. Clamp and Hunt each took four pounds of marijuana and gave the remaining pound to Roberts. Clamp, Hunt, and Roberts each took a box of marijuana pills. Clamp and Hunt took Sorokin's credit cards. Skuba took nothing. After Clamp and Hunt left, Skuba cried and told Roberts he could not believe what had happened. The next day Skuba gave Junior Sorokin's guitar because Junior played it well and Skuba did not know what else to do with it. That evening Senior, Junior and Roberts left for a motel after Skuba told Roberts they would be safer there and he gave her money to pay for a room.

On July 22, Clamp and Roberts arrived at Skuba's home where

7

> Clamp gave Skuba three of Sorokin's credit cards and told Skuba to buy him things as more compensation for what had happened. That evening Skuba and Roberts attempted to purchase $546 in merchandise from Target but the card was declined. Skuba felt awful using the credit cards but felt he had no choice.
>
> Before he was arrested, Skuba discussed the stolen marijuana situation with his supplier, Dominic, who was unhappy but accepted the loss because he knew Skuba would work off the debt. When arrested on July 30, Skuba had two bags of marijuana in his laptop bag, including the one-pound sample he had shown to Sorokin. Skuba did not hear from Dominic after he was arrested and taken into custody.
>
> The jury watched a DVD of Skuba's July 30 interview with the police. Skuba testified that almost everything he told the police during the interview was untrue. He lied to the police because he had been smoking methamphetamine, was sleep deprived, was scared of Hunt and Clamp, and was not thinking straight. Among his lies, Skuba told the police that Sorokin had a concussion but was conscious after the fight with Hunt, that Hunt left for the hospital in Sorokin's truck with Sorokin, who was alive at that point, and that he tried to call Sorokin several times after the assault.
>
> Skuba testified that he never told Roberts that he was going to jack a guy from Southern California for his weed. Skuba never spoke to Roberts about chloroform and he never had chloroform in his room. The only mention of chloroform was by Senior, when he told Skuba about a bad experience with a landlord. Skuba never went upstairs after the fight to tell Roberts and Wentzel they could come downstairs. He did not use the washing machine after the fight. He never told Roberts that he and Hunt had fought someone who was unconscious in the garage. He never told her that Sorokin's body went thudding down the cliff.

*People v. Skuba*, No. H037984, 2013 WL 6229134, at *1-6 (Cal. Ct. App. Dec. 2, 2013).

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

8

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *See Miller-El*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000). Moreover, in conducting its analysis, the federal court must presume the correctness of the state court's factual findings, and the petitioner bears the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

The state court decision to which § 2254(d) applies is the "last reasoned decision" of the state court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005). When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion. *See Nunnemaker* at 801-06; *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000).

## DISCUSSION

As grounds for federal habeas relief, Skuba asserts that: (1) the trial court failed to properly instruct the jury regarding felony murder; and (2) the trial court violated the Confrontation Clause of the Sixth Amendment by excluding evidence about the prosecution's principal witness that could be used for impeachment purposes.

9

## I. FELONY MURDER JURY INSTRUCTION

Skuba alleges that his due process rights were violated in that the trial court failed to sua sponte instruct the jury on the escape rule, California Criminal Jury Instruction ("CALCRIM") 3261, or alternatively, that the trial court failed to sua sponte modify CALCRIM 549 on the "continuous transaction rule." Skuba alleges that this resulted in incomplete instructions on a key element of felony murder, and thus violated his constitutional rights and due process.

### a. Background

As noted above, after the victim was knocked unconscious during the course of the robbery, Skuba and Clamp loaded him into a truck and drove up the coast. They then disposed of the unconscious victim by throwing him over the side of a cliff, where he fell to his death. The state court determined as a factual finding that Skuba was attempting to dispose of the unconscious victim and not fleeing the scene or escaping.

CALCRIM 3261 provides that "the crime of robbery continues until the perpetrator has actually reached a place of temporary safety." The perpetrator has reached a place of temporary safety if the jury finds that (1) he or she has successfully escaped from the scene; (2) he or she is no longer being chased; (3) he or she has unchallenged possession of the property; and (4) he or she is no longer in physical control of the person who is the target of the robbery. Skuba asserts that the trial court erred in not giving this jury instruction. According to Skuba the trial court also erred by not modifying CALCRIM 549, the instruction that was given. CALCRIM 549 provides that to show felony murder, the prosecution must prove that the robbery and the act causing the victims death were part of one "continuous transaction." Skuba argues that this instruction should have been modified because, according to him, the evidence supports the fact that he was fleeing the scene, and thus the escape rule applies.

Cal. Penal Code § 189 provides that murder is in the first degree when the killing is "in the perpetration of, or attempt to perpetrate," a robbery. Under California law, the phrase "in the perpetration of" includes a killing that occurs during the perpetrator's flight or escape from the scene of a robbery. The rule is in place to determine the outer temporal bounds of liability under felony murder, and concludes that any killing that occurs after a perpetrator reaches a place of

1  temporary safety is not committed in the perpetration of the robbery and does not constitute felony
2  murder.  Cal. Penal Code § 189.

### b. Legal Standard

A state trial court's refusal to give an instruction does not alone raise a ground cognizable in federal habeas corpus proceedings.  *See Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988).  The error must so affect the trial that the defendant was deprived of the fair trial guaranteed by the Fourteenth Amendment.  *See id*.  Due process requires that "'criminal defendants be afforded a meaningful opportunity to present a complete defense.'"  *Clark v. Brown*, 450 F.3d 898, 904 (9th Cir. 2006) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). Therefore, a criminal defendant is entitled to adequate instructions on the defense theory of the case.  *See Conde v. Henry*, 198 F.3d 734, 739 (9th Cir. 2000) (error to deny defendant's request for instruction on simple kidnapping where such instruction was supported by the evidence).

Due process does not require that an instruction be given unless the evidence supports it. *See Hopper v. Evans*, 456 U.S. 605, 611 (1982); *Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir. 2005).  The defendant is not entitled to have jury instructions raised on his or her precise terms where the given instructions adequately embody the defense theory.  *United States v. Del Muro*, 87 F.3d 1078, 1081 (9th Cir. 1996); *United States v. Tsinnijinnie*, 601 F.2d 1035, 1040 (9th Cir. 1979), *cert. denied*, 445 U.S. 966 (1980).

Whether a constitutional violation has occurred will depend upon the evidence in the case and the overall instructions given to the jury.  *See Duckett v. Godinez*, 67 F.3d 734, 745.  An examination of the record is required to see precisely what instruction was given and what instruction was refused and whether the given instructions adequately embodied the defendant's theory.  *Tsinnijinnie*, 601 F.2d at 1040.   In other words, a review of the record allows a determination of whether what was given was so prejudicial as to infect the entire trial and therefore deny due process.  *See id.*

The omission of an instruction is less likely to be prejudicial than a misstatement of the law.  *See Walker v. Endell*, 850 F.2d at 475-76 (citing *Henderson v. Kibbe*, 431 U.S. at 155). Thus, a habeas petitioner whose claim involves a failure to give a particular instruction bears an

11

"'especially heavy burden.'" *Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997) (quoting *Henderson*, 431 U.S. at 155). "[T]he significance of the omission of such an instruction may be evaluated by comparison with the instructions that were given.'" *Murtishaw v. Woodford*, 255 F.3d 926, 971 (9th Cir. 2001) (quoting *Cubb v. Naughton*, 414 U.S. at 156); *see id*. at 972 (due process violation found in capital case where petitioner demonstrated that application of the wrong statute at his sentencing infected the proceeding with the jury's potential confusion regarding its discretion to impose a life or death sentence).

### c. Discussion

The California Court of Appeal denied this claim:

> Here, the evidence is undisputed that Sorokin [the victim] never reached a place of temporary safety but instead remained under the control of Skuba and/or Clamp until he was thrown from a cliff. Under the prosecution's version of events, with Skuba present when Sorokin was thrown from a cliff, *Ramirez* would preclude an escape instruction because Sorokin remained under Skuba's control. And under the version of events with Skuba waiting alone in Clamp's truck while Clamp disposed of Sorokin, an escape instruction would be unnecessary under *Cavitt* because, with Sorokin under the control of Clamp, any escape efforts by Skuba would be irrelevant. (*Cavitt, supra*, 33 Cal.4th at p. 209.)
>
> In sum, Skuba was not entitled to an escape instruction in any form because Sorokin was under Skuba's control, or the control of Clamp, until he was killed. Skuba's outing was a callous trip to dispose of Sorokin, not an escape from the scene of the robbery. The trial court committed no error by not instructing the jury with any aspect of the escape instruction. Because we find no error, we do not address Skuba's arguments regarding prejudice and ineffective assistance of counsel.

*Skuba*, 2013 WL 6229134, at *10.

The state court's decision was not an unreasonable application of Supreme Court authority nor was it an unreasonable determination of the facts. The evidence showed that the victim never reached a place of temporary safety; instead, it demonstrated that Skuba participated in taking the victim to throw him off the cliff. While generally a perpetrator could be found to have reached a place of temporary safety if he no longer has physical control of the person who is the target of the robbery, that was not the situation in this case. Skuba was not escaping from the scene, he was disposing of a body and this finding by the state court was not unreasonable. An escape jury

instruction was not supported by the evidence and was not appropriate under these circumstances. Skuba has failed to demonstrate that the failure to sua sponte give this instruction violated due process.

Moreover, as the court of appeal found, even if there was an error it was harmless. The standard is "whether error had substantial and injurious effect or influence in determining" the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619 (1993). If the trial court had given an escape instruction, the fact that Skuba left the scene of the robbery in order to throw the victim off a cliff could not have led a reasonable juror to conclude that Skuba's liability was somehow reduced. For all these reasons he is not entitled to relief on this claim.

## II. CONFRONTATION CLAUSE

Skuba next argues that the trial court violated the Confrontation Clause of the Sixth Amendment by excluding impeachment evidence that the prosecution's principal witness, Kirstin Roberts, lied about her identity to police officers.

### a. Legal Standard

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with the witnesses against him." U.S. Const. amend. VI. This federal confrontation right applies to the states through the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400, 403 (1965).

The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. *Crawford v. Washington*, 541 U.S. 36, 61 (2004). It commands not that evidence be reliable, but that reliability be assessed in a particular manner: by testing it in the crucible of cross-examination. *Id.*; *see Davis v. Alaska*, 415 U.S. 308, 315-16 (1974) (noting a primary interest secured by the Confrontation Clause is the right of cross-examination). The Confrontation Clause thus reflects a judgment, not only about the desirability of reliable evidence, but about how reliability can best be determined. *Crawford*, 541 U.S. at 61; *see*, *e.g.*, *United States v. Medjuck*, 156 F.3d 916, 919 n.1 (9th Cir. 1998) (Confrontation Clause serves purposes of ensuring that witnesses will testify under oath, forcing witnesses to undergo

cross-examination, and permitting the jury to observe the demeanor of witnesses.); *Wood v. Alaska*, 957 F.2d 1544, 1549 (9th Cir. 1992) (the right to confrontation includes the right to cross examine adverse witnesses and to present relevant evidence).

Confrontation Clause claims are subject to harmless error analysis. *United States v. Nielsen*, 371 F.3d 574, 581 (9th Cir. 2004) (post-*Crawford* case); *see also United States v. Allen*, 425 F.3d 1231,1235 (9th Cir. 2005). For purposes of federal habeas corpus review, the standard applicable to violations of the Confrontation Clause is whether the inadmissible evidence had an actual and prejudicial effect upon the jury. *See Hernandez v. Small*, 282 F.3d 1132, 1144 (9th Cir. 2002) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)); *Webb v. Lewis*, 44 F.3d 1387, 1393 (9th Cir. 1994) (same). The standard on direct review of federal criminal convictions is "harmless beyond a reasonable doubt." *Nielsen*, 371 F.3d at 581.

**b. Discussion**

Here, the trial court barred evidence that on November 27, 2009, Kirstin Roberts gave a false name when stopped by the police, finding it more prejudicial than probative under California Evidence Code section 352. The California Court of Appeal rejected Skuba's claim that the trial court violated the Confrontation Clause:

> Roberts was presented as an accomplice to the robbery in this case. She had pleaded guilty to the robbery, and as a condition of her plea agreement, she promised to testify truthfully.
>
> The jury heard evidence that Roberts was abusing alcohol and methamphetamine in July 2009. Indeed, the prosecutor admitted in closing argument that Roberts' memory was compromised by alcohol abuse. Evidence was also presented that Roberts looked for something to steal from Sorokin's truck, offered Sorokin's credit card to Senior, and tried to purchase personal items from Target using one of Sorokin's credit cards. She also admitted to a felony forgery conviction-cashing forged checks stolen from Skuba's housemate, including one for about $750-and a conviction for drunk driving involving an injury. She testified that she lied to the police during her initial questioning regarding her involvement in the robbery. For example, Roberts initially told police she saw Skuba move Sorokin from the garage to the bed of the pick-up truck. But she retracted that statement at trial, explaining she could not see the front of the garage or the pick-up truck from her position on the balcony, but only heard sounds of Sorokin's body being moved from the garage to the truck.

14

> Given the extent of Roberts' testimony on these subjects, we reject Skuba's assertions that her testimony presented a false aura of veracity to the jury. We further reject Skuba's argument that the omitted evidence would have established a pattern of dishonesty and would have left the jury with a different impression of Roberts' credibility. (*Chatman*, *supra*, 38 Cal.4th at p. 372.) Thus, no confrontation clause violation resulted, nor did the trial court abuse its discretion, by excluding evidence that Roberts falsely identified herself to police in November 2009.

*Skuba*, 2013 WL 6229134, at *12.

In *Delaware v Van Arsdall*, 475 U.S. 673 (1986), the Supreme Court noted that "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Id*. at 679. The clause guarantees "an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985).

In this case, the trial court's actions were reasonable because the evidence that was excluded, that Roberts had previously lied to police and given a false name when pulled over, was cumulative and only marginally relevant. The trial court had already allowed extensive impeachment of Roberts by Skuba for her prior convictions of forgery and drunk driving causing injury, evidence that she was an accomplice to the robbery, evidence that she had a severe drug and alcohol problem that impaired her memory, and perhaps most importantly, that she had lied to the police about important details of this case when she was first questioned. Skuba was given ample opportunity for cross-examination, and the trial court excluded only one of many attacks on Roberts. There was a great deal of evidence that was admitted to impeach her. As the state court noted, she did not present a "false aura of veracity" to the jury, as Skuba alleges, and a pattern of dishonesty was already established in her testimony. *Skuba*, 2013 WL 6229134, at *12.

Moreover, any possible error was harmless. The jury would have had to disbelieve the three other witnesses who testified to the same events as Roberts. Their testimony all supported Roberts' testimony in the key aspects of Skuba's involvement in the robbery and murder, and thus, even if it was error for the court to exclude the evidence that she gave a false name to the police,

15

the error was harmless. Skuba has not shown that the jury would have reached a more favorable result had it heard that Roberts had lied about her identity during the traffic stop, given the overwhelming evidence of Skuba's guilt. The exclusion of impeachment evidence did not violate the Confrontation Clause, and the state court's denial of this claim was not an unreasonable application of Supreme Court authority.

### III.     CERTIFICATE OF APPEALABILITY

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability. *See* Rules Governing § 2254 Cases, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard. *Id*. § 2253(c)(3). "Where a district has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straight forward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Here, petitioner has made no showing warranting a certificate and so none is granted.

### CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is **DENIED**. A Certificate of Appealability is **DENIED**. *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

**IT IS SO ORDERED.**

Dated: October 13, 2015

_____
JAMES DONATO
United States District Judge

16

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

STEWART L. SKUBA,

    Plaintiff,

v.

JOE A. LIZARRAGA,

    Defendant.

Case No. 14-cv-03758-JD

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on October 13, 2015, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Stewart L. Skuba ID: AK-9172
Mule Creek State Prison
P.O. Box 409060
Ione, CA 95640

Dated: October 13, 2015

Susan Y. Soong
Clerk, United States District Court

By: _____
LISA R. CLARK, Deputy Clerk to the
Honorable JAMES DONATO

17